UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| VIVIAN KHUU, *individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>vs.<br><br>CITIBANK, NATIONAL ASSOCIATION,<br><br>Defendant. | **4:24-CV-04037**<br><br>OPINION AND ORDER GRANTING MOTION TO COMPEL AND STAYING PROCEEDINGS |

Plaintiff Vivian Khuu seeks to challenge in a class action lawsuit Citibank's alleged practice of charging Deposited Check Returned Unpaid fees. (Doc. 1 ¶4.) According to the Complaint, the challenged practice assesses a fee against accountholders who seek to deposit a check when the issuer of the check had insufficient funds to cover the amount of the check. To be clear, the challenged practice does not describe fees that banks might impose on the party *issuing* a check without sufficient funds; the practice describes a fee imposed on the *recipient* of the bad check. Plaintiff's Complaint alleges this practice is unfair and unlawful, describing various legal theories and citing legal authorities in the effort to seek redress for Citibank accountholders. Echoing a Consumer Financial Protection Bureau Bulletin, Plaintiff explains accountholders could not reasonably avoid the fees incurred because they were not in a position to know whether the checks would clear. (Doc. 1 ¶6.) Defendant filed an Answer to the Complaint as well as a Motion to Compel Arbitration. (Docs. 11, 12.) After a careful review of the facts and analysis of the governing law, the Court GRANTS the Motion to Compel Arbitration.

## I.    FACTS

### A. Account Opening

The parties agree that Ms. Khuu opened a Citibank account in California. (Docs. 1, ¶9; 26, ¶4.) Citibank records indicate that she opened Regular Checking and Citi Savings accounts on July 11, 2020. (Doc. 15, ¶4; 11, ¶4.)    Though the parties have offered declarations about the process and circumstances surrounding the opening of the account, neither party has provided a copy of the comprehensive terms and conditions that governed Citibank consumer accounts as of July 11, 2020, the apparent date Ms. Khuu's account was opened.   Instead, the parties have provided other documents with later effective dates and challenged each other's assertions as to the applicability of the terms presented, as described further below.

Ms. Khuu stated in her Declaration that she recalled opening her bank account with an electronic tablet presented by the bank.  (Doc. 24, ¶6.)  She declares that the tablet only displayed a signature block, that she did not have an opportunity to review the terms and conditions that governed her account, and that she was not provided a copy of the Deposit Agreement nor the Client Manual. (Doc. 24, ¶¶ 4-6.) By contrast, Ms. Neill declares that at the time Ms. Khuu opened her Citibank account, the bank's procedures for in-branch account opening in El Monte, California did not employ the use of electronic tablet.  (Doc. 26, ¶5.)  Instead, physical signature cards were printed and presented to the customer for signing.  (Doc. 26, ¶5.)  Ms. Neill declares that the signature card attached as Exhibit A to her Declaration was signed by Ms. Khuu physically and as a complete document "presented in its entirety to the customer" and later scanned into Citibank records. (Doc. 26 ¶5.) The signature card provided that:

> By signing below, I: (1) confirm I have received and agree to be bound by all Citibank, N.A. terms and conditions applicable to my account(s), including the Client Manual Consumer Accounts, its Marketplace Addendum and/or any applicable loan note(s) or agreement(s), and (2) understand and acknowledge that, if applicable, such note(s)/agreement(s) provide that any dispute between us will be resolved by binding arbitration.

(Doc. 15-1 at 268.)   Ms. Khuu has not specifically denied that the signature card that Citibank attached as Exhibit A to the Declaration of Ms. Neill bears her signature; however, Ms. Khuu states that she did not receive the Client Manual referenced in the signature card before affixing her signature. (Doc. 24 ¶¶6-12.) Ms. Neill declares that Citibank's procedure at the time was for a branch employee to distribute a physical copy of the Client Manual and Marketplace Addendum

to customers in the branch at the time of the account opening. (Doc. 26, ¶6.) It is not evident from the face of the signature card whether the signature was applied on paper or electronically. (Doc. 15-1 at 268.)

## B. Account Conversion Process

The parties agree that on or about December 2, 2021, Ms. Khuu converted her checking account and savings account from "Citi Priority" to "Basic Banking." (Doc. 15 ¶5, Doc. 24, ¶13.) Citibank offers various details about the account conversion process that it had in place in late 2024 and argues that such a process formed a binding arbitration agreement between the parties. Ms. Khuu denies that such an agreement was formed, offering her own declaration about what she saw and understood when converting her account.

Ms. Khuu declares that she recalls using an electronic tablet provided by Citibank to execute her account conversion. (Doc. 24, ¶13.) She declares that she was not presented with and did not review the Client Manual nor the Deposit Agreement before she signed the tablet in connection with converting her account and was not informed by Citibank "that any disputes related to [her] account were subject to an arbitration agreement." (Doc. 24, ¶¶14-18.) She declares that in converting her account, she was not aware of entering into a contract requiring arbitration and did not knowingly agree to any arbitration terms. (Doc. 24, ¶22.)

Francesca Welham, a 13-year employee with Citibank who declares having personal knowledge of the general business practices of Citibank with respect to its checking and savings accounts and access to the business records relating to the checking and savings accounts issued by Citibank, states that on December 2, 2021, Ms. Khuu converted her checking and savings accounts at a branch in El Monte, California using Ms. Khuu's personal mobile device rather than an electronic tablet provided by Citibank. (Doc. 27, ¶¶4, 11.)

Ms. Welham declares that "[a]s part of a routine (monthly) testing to ensure the process was working as designed," [she] tested the same account-conversion process on her mobile device, using the disclosure process as it existed as of December 2021," and captured images of what she [Ms. Welham] saw on the screen of the device she used for testing ("screenshots"). (Doc. 27, ¶4.) Ms. Welham declares that true and correct copies of these screenshots are attached as Exhibit A to

her Declaration. (Doc. 27, ¶¶4-10.) While most of these screenshots are not dated, one bears the date November 24, 2021. (Doc. 27-3 at 449.) The multi-step process is described below.

To start the account conversion process that Ms. Welham tested, the accountholder would have been required on the accountholder's personal mobile device[1] to navigate to a particular docusign.net website bearing a Citibank logo (the "Docusign Site"). (Doc. 27 ¶¶5-7; Doc. 27-1 at 436.) The message first displayed at the Docusign Site directed the accountholder to "complete a two-step authentication process . . . ."[2] (Doc. 27 ¶¶5-7; Doc. 27-1 at 436.)

Following the two-step authentication process, the accountholder would have encountered several more screens on the Docusing Site, presumably all on the same personal device used in the initial step. In particular, the next screen—reproduced at page 439 of the record—would have had the heading "Please Review & Act on These Documents" followed by these instructions:

> A Citi representative has sent you a document outlining your requested changes and associated terms and conditions, if applicable. Please click on the link to review the document and provide your consent.

This screen—at page 439 of the record—also would have directed the accountholder to "please read the <u>Electronic Record and Signature Agreement</u>," which was the screenshot suggests would have been available by hyperlink at the bottom of the screen and would have directed the accountholder to "indicate . . . agreement to proceed by checking the below Check Box" next to the words "I agree." Presumably the accountholder who checked the box would have needed to

---

[1] The Declaration notes, "Plaintiff used a 'client device' – not a Citibank tablet." (Doc. 27 ¶ 12.) Although the term "client device" can be used in the field of information technology to distinguish customer-facing computers from computer servers, Citibank's Declarant indicates a more specific meaning of "client device" to refer to a device owned by a banking customer.

[2] As part one of the two-step authentication process, the accountholder would have been required to enter an access code consisting of "the last two digits of [the accountholder's] birth year + the last four digits of [the accountholder's] mobile phone number on file." (Doc. 27-1 at 436.) Once the accountholder submitted this access code on the screen of the accountholder's personal mobile device, the accountholder, still using that device, would have proceeded to a new screen on the Docusign Site (the second part of this two-step authentication process). (Doc. 27 ¶¶5-7.) In the second part of this authentication process, the instructions on the Docusign Site would have asked the accountholder to enter a phone number that can receive text messages for authentication purposes. (Doc. 27 ¶¶5-7; Doc. 27-1 at 437.) (Whether the phone number had to be associated with the personal mobile device being used to enter information on the Docusign Site is not clear, but it appears the accountholder would have needed to have access to text messages sent to the phone number provided in order to proceed through the next steps of the authentication and account conversion process.) Then, a text message with an authentication code would have been sent from Citibank to the accountholder at the phone number provided. Once the accountholder retrieved the authentication code from the text message, the accountholder would have entered this authentication code at Docusign Site and clicked "confirm" to submit the authentication code. (Doc. 27-1 at 438.)

click "Continue" in order to proceed to the next screen on the Docusign Site that is provided at page 440 of the record. (Docs. 27 ¶ 8; 27-1 at 439-40.)

The next screen that the accountholder would have seen on the Docusign Site on the personal mobile device—page 440 of the record—bears the heading "Consent to Consumer Banking Package." Under the heading "Consent to Convert Consumer Banking Package" appear the words "I hereby request the following changes to my current banking package;" fields to designate the "Account Number," the "current Banking Package," and the "Banking Package Requested;" and a statement that "All linked accounts in current package will be converted to new package type." (Doc. 27-1 at 440.) The following paragraph then appears above a signature line:

> By signing below, I: (1) confirm I have received and agree to be bound by all Citibank, N.A. terms and conditions applicable to my account(s), including the Client Manual Consumer Accounts, its Marketplace Addendum and/or any applicable loan note(s) or agreement(s), and (2) understand and acknowledge that, if applicable, such note(s)/agreement(s) provide that any dispute between us will be resolved by binding arbitration.

(Doc. 27-3 at 449.)[3] Below the text and signature line on the "Consent to Convert Consumer Banking Package" screen is a list of five items, each on its own line in blue underlined text with, at the end of each line, a square icon with an arrow pointing to the upper-right corner ("a pop-out window icon"): [1] Client Manual, [2] Citi Marketplace, [3] U.S. Online Privacy Notice for Customers, [4] Plan Talk – Citibank Account, and [5] Rate Sheet. (Doc. 27-3). Ms. Welham identifies these five lines of text as "hyperlinks to, among other things, the Client Manual." (Doc. 27 ¶ 9). The signature line is designated by a yellow box with a red arrow. (Doc. 27-1 at 440.) It appears the accountholder would have had to click on the yellow box and affix a signature to the document labeled "Consent to Convert Consumer Banking Package" in order to proceed to the next screen. (Doc. 27¶9; Doc. 27-1 at 440-1.) The "Consent to Consumer Banking Package" presented on this screen is presumably the document referred to on the previous screen that the "Citi representative . . . sent [to the accountholder]." (Doc. 27-1 at 439.)

---

[3] The same language appears more legibly at page 449 of the record. (Doc. 27-3.) It also appears in a different format (unsigned) in the Signature Card (Reference Copy) at page 54 of the Client Manual of November 18, 2021 (Doc. 15-4 at 330) and in copies that appear to bear Ms. Khuu's signature 453 of the record. (Doc. 27-5 at 453; Doc. 15-2 at 270).

The next screen on the Docusign Site would presented the question "Are you finished signing?" and a button labeled "Finish" near the top of the screen. A second "Finish" button appeared at the bottom of the screen that displayed Ms. Welham's affixed signature, below the hyperlinked documents. (Doc. 27-1 at 441.)

Then, it appears the accountholder who had clicked "Finish" would have been sent an email confirming completion of the signature process via DocuSign. (Docs. 27 ¶ 10, 27-1 at 442.) It appears the confirmation email would have included the text "View Completed Document," and presumably clicking this would have allowed the accountholder to view the Consent to Convert Consumer Banking Package form with the accountholder's electronic signature affixed to it. (Doc. 27-1 at 442; Doc 27 ¶ 10, 14; *see also* Doc. 27-5 at 453.) A screenshot identifying what the accountholder who received such an email would have seen by clicking on the "View Completed Document" has not been provided in the record. It is unclear whether the completed document contained active hyperlinks to the Client Manual and thus whether accountholders could review the Arbitration Agreement after completing the account conversion. (Doc. 27-1 at 442.)

Citibank also has in its records a version of the "Consent to Convert Consumer Banking Package" form with Ms. Khuu's signature affixed to it, which Ms. Welham explains, was generated when Ms. Khuu entered her electronic signature on a screen of her personal mobile device, using the process Ms. Welham documented at the Docusign Site. (Doc. 27 ¶14; 27-5 at 453; *see also* Doc. 15-2 at 270, Doc. 27-3 at 449.)[4] Presumably, this is the same document that would have been emailed to Ms. Khuu and available at the "View Completed Document" link described above though Citibank's Declaration does not state this explicitly. (Doc 27 ¶ 14; Doc. 27-1 at 442.) Ms. Welham declares that this executed document could only have been generated after Ms. Khuu proceeded on her mobile device through the account conversion process described above. (Docs. 27 ¶14, 27-1 at 440; 27-5.) The hyperlinks displayed below the signature block on pages 440 and 441 of the record, do not appear (below the signature block or anywhere else) on the executed

---

[4] It appears Citibank produced the same "Consent to Convert Consumer Banking Package" form bearing Ms. Khuu's signature in two copies: Doc. 15-2 at 270 and Doc. 27-5 at 453. The same language, in a different format and without a signature, appears in the Signature Card (Reference Copy) at page 54 of the Client Manual of November 18, 2021. (Doc. 15-4 at 330) and in the screenshots taken as part of Ms. Welham's test procedure. (Doc. 27-3 at 449; *see also* 27-1 at 440-41.)

version of the "Consent To Convert Consumer Banking Package." (Docs. 15-2 at 270; 27-5 at 453.)

To support its position that Ms. Khuu completed the account conversion process using Citibank's intended process, Citibank also produces a DocuSign Certificate of Completion bearing Ms. Khuu's name that includes the words "Signed by mobile" next to a record of the IP address associated with the mobile device that was used to apply the electronic signature. (Doc. 27-2.) The DocuSign Certificate of Completion indicates that on December 2, 2021, at 1:13:50 PM, Ms. Khuu was sent the account conversion documents, that she viewed them at 1:15:21 PM and signed them at 1:15:50 PM that day and shows a copy of her signature. (Docs. 27-2 at 444; 27-5.)

## C. Client Manual of November 18, 2021

According to Citibank, as part of the account conversion process described above, Ms. Khuu became bound by the arbitration terms of the Client Manual incorporated by reference into the "Consent to Convert Consumer Banking Package." (Doc. 13 at 141.) Ms. Khuu denies that such an agreement was formed. The main terms related to consumer arbitration appear between pages 51 and 53 of the Client Manual. (Doc. 15-4 at 327.) Relevant excerpts of this section are reproduced below (with approximate formatting):

> **PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.**
>
> THIS SECTION PROVIDES THAT DISPUTES MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT. THIS ARBITRATION PROVISION IS GOVERNED BY THE FEDERAL ARBITRATION ACT (FAA), AND SHALL BE INTERPRETED IN THE BROADEST WAY THE LAW WILL ALLOW.
>
> **Covered Disputes**
>
> You or we may arbitrate any claims, dispute or controversy between you and us arising out of or related to your account(s), a previous related account or our relationship (called "Disputes").
>
> **If arbitration is chosen by any party, neither you nor we will have the right to litigate that Dispute in court or have a jury trial on that Dispute.**

> Except as stated below, all Disputes are subject to arbitration no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek, including claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law; claims made as counterclaims, cross-claims, third party claims, interpleaders or otherwise; claims made regarding past, present or future conduct; and claims made independently or with other claims. Disputes include any unresolved claims concerning any services relating to such account, including without limitation, safe deposit box services, wire transfer services, and use of Citibank® Banking Card or Citibank® Banking Card displaying the MasterCard® Brand Mark. This also includes claims made by or against anyone connection with us or you or claiming through us or you, or by someone making a claim through us or you, such as a joint account owner, account beneficiary, employee, agent, representative, predecessor or successor, heir, assignee, trustee in bankruptcy, or an affiliated/parent/subsidiary company. A party who initiates a proceeding in court may elect arbitration with respect to any dispute advanced in that proceeding by any other party. Disputes include claims made as part of a class action or other representative action, it being expressly understood and agreed to that the arbitration of such claims must proceed on an individual (non-class, non-representative) basis. Disputes also include claims relating to the enforceability or interpretation of any of these arbitration provisions. Any questions about whether Disputes are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced.

(Doc. 15-4 at 327.)  Under the sub-heading "Arbitration Limits," the Client Manual proceeds:

> If you assert a Dispute against us, we can choose to arbitrate.

(Doc 15-4 at 327.) The Client Manual continues under the sub-heading "How Arbitration Works,"

> Arbitration may be requested at any time, even when there is a pending lawsuit, unless a trial has begun or a final judgment entered. . . . To choose arbitration, a party may file a motion to compel arbitration in a pending matter and/or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.

(Doc15-4 at 328.) The Arbitration Agreement contained an opt-out clause providing:

> **Rules for Rejecting This Arbitration Provision**
>
> You may reject this arbitration provision by sending a written rejection notice to us at: 100 Citibank Drive, Attn: Arbitration Opt Out, San Antonio, TX 78245. Your rejection notice must be mailed within 45 days of account opening. Your rejection notice must state that you reject the arbitration provision and include your name, address, account number and personal signature. . . .

(Doc. 15-4 at 329.)

8

In addition, some general terms that appear earlier in the Client Manual describe how the agreement is structured and bear on arbitration. (Doc. 15-4 at 281.) In particular, under the section titled "Account Opening/Ownership/Maintenance," on page 9 of the Client Manual, the following term is set forth:

> This Agreement contains an arbitration provision that explains that you cannot go to court, have a jury trial or initiate or participate in a class action if you have a dispute with us. Instead, this provision tells you that the dispute must be resolved by a professional arbitrator, not a judge or jury. This section also explains how arbitration works and some of the differences between resolving a dispute in arbitration and resolving one in court. All of the terms of the arbitration provision are set forth in the section entitled "Arbitration." Please read it carefully.

(Doc. 15-4 at 285.)

### D. Consumer Deposit Agreement of August 19, 2023 – Attached to the Complaint

Ms. Khuu has not conceded that the Client Manual produced by Citibank was binding on her at the time of, nor after, her account conversion. However, she has produced a Consumer Deposit Account Agreement bearing a Citi logo and an effective date of August 19, 2023. (Doc. 1-1 at 24.) Ms. Khuu has not indicated when or where she became aware of the terms appended to the Complaint, which alleges, "Acceptance of the Agreement's terms is mandatory[5] for both opening and maintaining a deposit account with Citibank" and that each member of the Class, including Ms. Khuu, "entered into a uniform Deposit Agreement with Fee Schedule." (Doc. 1 ¶ 49).[6]

The "Arbitration" section of the Consumer Deposit Account Agreement, which begins on page 66, appears to be identical to the "Arbitration" section that begins at page 51 of the Client Manual. (Doc. 1-1 at 2-3, 68-70 *cf.* Doc. 15-4 at 278, 281, 327-329.) However, various other terms

---

[5] Defendant argues that the arbitration agreement is "not mandatory" because it contained an opt-out provision. (Doc. 13 at 143.) Nothing in the record indicates an attempt to opt out of the arbitration clause. Ms. Khuu's position is that she did not have notice of the arbitration terms. (Doc. 24.)

[6] Plaintiff references the attached agreement in making its argument that the Defendant was not entitled to charge fees to accountholders when deposited checks were returned unpaid, pointing to section 5.8 of the Consumer Deposit Account Agreement, which, under the heading "Fees," identifies "Overdraft and Returned Items" as examples of "Services provided at no charge." (Docs. 1 ¶ 21; 1-1 at 53.) In its Answer to the Complaint, "Citibank denies that the version of the Citibank Consumer Deposit Account Agreement attached to the Complaint as Exhibit A (effective August 19, 2023) was the agreement in effect at the time the charge alleged in . . . the Complaint was allegedly incurred in February 2023, or [or in the case of other class members, the agreement] in effect at the time any other such charge was assessed to any other member of the class identified in the Complaint." (Doc. 11 ¶¶11, 12, 23.)

of the Consumer Deposit Account Agreement differ from those of the Client Manual. In particular, the "General Terms" of the Consumer Deposit Account Agreement do *not* include the same language that appeared in the "General Terms" of the Client Manual, which stated explicitly "that you cannot go to court, have a jury trial or initiate or participate in a class action if you have a dispute with us. Instead, . . . the dispute must be resolved by a professional arbitrator, not a judge or jury." Instead, the bottom of page 1 of the Consumer Deposit Account Agreement states, "In the event of a dispute involving you and Citibank, you may not be able to go to court, have a jury trial or initiate or participate in a class action." (Doc. 1-1 at 26.) On the same page, the Consumer Deposit Account Agreement describes it as the governing agreement for Consumer Deposit Account and notes that "Your Accounts may be subject to additional agreements when you enroll in optional services." (Doc. 1-1 at 26.)

## II.    STANDARD OF REVIEW

When, as is here, the parties submit affidavits in conjunction with a motion to compel arbitration, a court must treat the motion akin to a motion for summary judgment. *Duncan v. Int'l Markets Live, Inc.*, 20 F.4th 400, 403 (8th Cir. 2021). Accordingly, granting a motion to compel arbitration is proper if, like summary judgment, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*) (citing Fed. R. Civ. P. 56(c)(2)). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A dispute over a fact is 'genuine' only if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Pitman Farms v. Kuehl Poultry, LLC*, 48 F.4th 866, 875 (8th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 US. 242, 248 (1986)).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014). "'Only when there is no genuine issue of fact concerning the formation of the agreement' should the court decide as matter of law that an agreement to arbitrate existed." *Card v. Wells Fargo Bank*,

*N.A.*, 611 F.Supp.3d 1080, 1083 (D. Or. 2020) (quoting *Three Valleys Mun. Water Dist. V. E.F.
Hutton & Co.,* 925 F.2d 1136, 1141 (9th Cir. 1991).

However, "admissions in the pleadings are binding on the parties and may support
summary judgment against the party making such admissions." *Missouri Housing Dev. Com'n v.
Brice*, 919 F.2d 1306, 1315 (8th Cir. 1990) (citing *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d
105 (5th Cir.1987). In general, admissions in pleadings are binding "even if the post-pleading
evidence conflicts with the evidence in the pleadings." *Id.* "As a rule, '[a]dmissions in the
pleadings . . . are in the nature of judicial admissions binding upon the parties, unless withdrawn
or amended.'" *United States v. Midtling*, 615 F.Supp.3d 942, 947 (D. Minn. Jul. 18, 2022) (quoting
*Mo. Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314 (8th Cir. 1990)).

## III.    DISCUSSION

The parties acknowledge that the Federal Arbitration Act governs arbitration clauses
arising from transactions in interstate commerce, including the one at issue in this case. (*See* Docs.
13 at 144; 22 at 396). "Section 2 of the FAA provides that '[a] written provision in any . . . contract
. . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid,
irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation
of any contract." *Owen v. Bristol Care, Inc.*, 702 F.3d 1050, 1052 (8th Cir. 2013) (quoting 9 U.S.C.
§ 2); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011); 9 U.S.C. § 4 ("[U]pon
being satisfied that the making of the agreement for arbitration or the failure to comply therewith
is not in issue, the court shall make an order directing the parties to proceed to arbitration in
accordance with the terms of the agreement."). "A court's role under the FAA is limited to
determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the
agreement encompasses the dispute." *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th
Cir. 2004) (citing *Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 680 (8th Cir.2001)).

State contract law governs whether a valid agreement to arbitrate exists and federal
substantive law of arbitrability is considered in determining whether the litigants' dispute falls
within the scope of the arbitration agreement. *Triplet v. Menard, Inc.*, 42 F.4th 868, 871 (8th Cir.
2022) ("State contract law governs whether a valid agreement to arbitrate exists."); *Dominium
Austin Partners, LLC v. Emerson*, 248 F.3d 720, 729 n.9 (8th Cir. 2001) ("The construction of an

agreement to arbitrate is governed by the FAA unless the agreement expressly provides that state law should govern.").

The parties agree that California law applies in determining whether a valid arbitration agreement exists.[7] (Doc. 13 at 145; 22 at 398). The party seeking to compel arbitration must prove the existence of an agreement to arbitrate by a preponderance of evidence. In *Rosenthal v. Great Western Fin. Securities Corp.*, the California Supreme Court explained,

> "[W]hen a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable. Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence."

*Rosenthal v. Great Western Fin. Securities Corp.*, 14 Cal.4th 394, 413 (1996), *see also Hofman v. Fidelity Brokerage Servs., LLC*, 2023 WL 3872564 at *2 (2023) (citing *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)). Once the moving party has demonstrated the existence of a valid arbitration agreement that encompasses the dispute, the burden then shifts to the party opposing arbitration to establish an arbitration-neutral contract defense. "If the party opposing the petition raises a defense to enforcement . . . that party bears the burden of . . . proving by a preponderance of the evidence, any fact necessary to the defense." *Rosenthal*, 14 Cal.4th at 413 (citing *Strauch v. Eyring*, 30 Cal.App.4th 181, 186 (1994)); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (stating that an arbitration agreement may only "be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue") (citing *Doctor's Associate, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)); *Madol v. Dan Nelson Auto. Grp.*, 372 F.3d 997, 999 (8th Cir. 2004).

---

[7] Citibank identified the governing law of the Client Manual and the Client Manual Agreement as the applicable state law is that of the state where Plaintiff opened her account, which is in this case in California. (Docs. 13 at 145-6). Without conceding the applicability of these contract terms, Ms. Khuu references California contract law in responding to the Defendant's Motion to Compel Arbitration. (Doc. 22 at 398). Courts have observed that states apply "substantially similar rules of determining whether the parties have mutually assented to a contract term." *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 835 n.4 (2d Cir. 2021) (comparing New York and California); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) ("As California and Massachusetts law apply 'substantially similar rules,' we need not engage in a detailed choice-of-law analysis.")

## A. Existence of an Arbitration Agreement

To form a contract under California law, there must be "mutual assent, or consent, of the parties." *B.D. v. Blizzard Entertainment, Inc.*, 76 Cal.App.5th 931, 943 (9th Cir. 2022) (citing *Sellers v. JustAnswer LLC*, 73 Cal.App.5th 444, 460 (2021)). "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Sellers*, 73 Cal.App.5th at 460. "If an offeree objectively manifests assent to an agreement, the offeree cannot avoid a specific provision of that agreement on the ground the offeree did not actually read it." *Blizzard Entertainment*, 76 Cal.App.5th at 943 (citing *Pinnacle*, 55 Cal.4th 223, 236 (2012)). However, "[a]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 566 (9th Cir. 2014). To be clear, "[m]utual assent does not require that the consumer have actual notice of the terms of the arbitration agreement." *In re Juul Labs, Inc., Antitrust Litigation*, 555 F. Supp. 3d 932, 947 (N.D. Cal. 2021) (citing *Long v. Provide Commerce, Inc.*, 245 Cal.App.4th 855, 863 (2016)). "Where there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74–75 (2d Cir. 2017) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.2d 1171, 1176 (9th Cir. 2014)).

Ms. Khuu argues that Citibank has not carried its burden of proof establishing the existence of a valid arbitration agreement. (Doc. 22 at 398-99.) In particular, Ms. Khuu argues that proof of her signature on the signature card issued at account opening and the "Consent to Convert Consumer Banking Package" form issued at account conversion do not establish by a preponderance of evidence that she assented to arbitration. (Doc. 22 at 398-99.) Ms. Khuu argues that in order to establish that she assented to arbitration, Citibank must show that Ms. Khuu "was provided with the arbitration agreement and given meaningful notice and opportunity to review the contents thereof prior to consummation of the transaction." (Doc. 22 at 399.) She argues that "Citibank fails to provide any evidence that it *ever actually presented Ms. Khuu with a copy of these documents*." (Doc. 22 at 393 (emphasis in original).) By contrast, Citibank argues that it met the burden of showing an arbitration agreement was formed. Citibank points to Ms. Khuu's

signatures on the signature card and Consent to Convert form as evidence that she received the governing agreements and agreed to their terms. (Doc. 25 at 420-22.)

For several reasons, the Court is not persuaded that the record conclusively demonstrates an arbitration agreement was formed when Ms. Khuu visited the bank for the account opening and account conversion transactions. First, Ms. Khuu's account of the account opening transaction conflicts with Citibank's account of the procedures that were in place at the time.[8] Second, the language of the signature card does not obviously put a consumer on inquiry notice of the arbitration terms; though this language references arbitration, it does not expressly state that the Client Manual Consumer Accounts and its Marketplace Addendum, referenced earlier, address arbitration, instead suggesting that the arbitration process is applicable to customers who enter

---

[8] Citibank argues that Ms. Khuu consented to arbitration when she opened her account by signing a signature card confirming receipt of "all Citibank, N.A. terms and conditions applicable to [her] account, including the Client Manual . . . ." (Doc. 13, Doc. 15-1). While there is no dispute that Ms. Khuu signed the card, there are other open issues that must consider, construing the record in the light most favorable to the non-moving party.

Citibank's declarant, Ms. Neill, states that it was Citibank's procedure at the time of Ms. Khuu's account opening to distribute a physical copy of the Client Manual Consumer Accounts and its Marketplace Addendum to the customer at the time of account opening." (Doc. 26 ¶ 6). Citibank has not identified which employee worked with Ms. Khuu to open her account nor evidence that such an individual received instructions, participated in training, or documented compliance with the procedure of providing the Client Manual and other documents to new accountholders. Moreover, Citibank's assertion that printed signature cards were used in its procedures for account opening at the time is not buttressed with evidence of how and when those procedures were instituted or revised. If, for example, Citibank had evidence that it had not procured electronic tablets for signing by that date, it would strain credulity to conclude that Ms. Khuu signed electronically. However, if Citibank had such tablets available at the time of account opening and typically only used them for other purposes with various technological workarounds available to employees, it would be much easier to credit Ms. Khuu's recollection. Though a fact-finder might conclude that the signature card was printed and signed on paper (what Citibank's declarant describes as "signed physically") (Doc. 15 ¶5), it is not evident from the face of the signature card that this is how it was processed. (Doc. 15-1.) If she signed a printed signature card, the Court would be inclined to conclude that she saw and accepted all the text on the signature card, but if she signed electronically, the Court would not be so ready to reach that conclusion without an indication of what text she would have seen on her screen.

The facts developed at this stage, though valuable and reasonably reliable, are limited and, at times, imprecise. For example, while Citibank's Answer to the Complaint indicates that Ms. Khuu opened an account in Rosemead, California, a subsequent declaration by Laura M. Neill, a 26-year employee of Citibank, indicates that the account opening transaction took place at a Citibank branch located in El Monte, California. (Doc. 11, ¶ 3 *cf.* Docs. 15-1 at 268;26, ¶ 4). The precise branch location of the account opening is not disputed at this time; it is suggestive of the kind of factual issues that arise in cases like this one.

Citibank urges the Court to treat Ms. Khuu's recollection that she only saw a signature block as self-serving testimony. (Doc. 25 at 417.) While the Court is unable to weigh the evidence in ruling on a motion to compel arbitration, applying the same standard as in a motion for summary judgment, the Court is not obligated to credit a statement contradicted by objective evidence in the record. *See Smith v. Golden China of Red Wing, Inc.*, 987 F.3d 1205, 1209 (8th Cir. 2021); *see also Reed v. City of St. Charles*, 561 F.3d 788, 791 (8th Cir. 2009) (district court is not required to accept unreasonable inferences or sheer speculation as fact); *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006) (holding that the district court properly discounted a self-serving affidavit which was contradicted by other objective evidence in the record). At this stage, the Court does not discredit Ms. Khuu's recollection of signing a tablet during the account opening nor conclude that a Citibank employee provided Ms. Khuu with the Client Manual and other documents in accordance with Citibank procedures.

loan "note(s)/agreement(s)." (Doc. 27-3 at 449.) Third, the while Citibank casts doubt on Plaintiff's statement that only a signature was displayed for her to see during the account conversion transaction, describing it as a "dubious assertion that she did no more than sign a blank tablet," the Court is not so incredulous. (Doc. 25 at 424). The record does not require the conclusion that the images captured by Ms. Welham using her own personal device on or around November 24, 2021 appeared the same way on the (personal or other device) screen that Ms. Khuu saw at the bank on December 2, 2021, nor that Ms. Khuu – whose signature appears on a "Consent to Convert Consumer Banking" form without apparent hyperlinks – would have seen the hyperlinks that appear in Ms. Welham's screen shots. (*Compare* Docs. 27 ¶4; 27-3 *with* Docs. 27-5; 24, ¶ 13.)

During oral argument, the parties addressed the possibility that an evidentiary hearing was required under *Foster v. Walmart. Foster v. Walmart, Inc.*, 15 F.4th 860 (8th Cir. 2021). The issue was raised in advance of Oral Argument by the Court in an Order addressing *Foster v. Walmart.* (Doc. 32.) Citibank took the position that an evidentiary hearing is not necessary because the record provides sufficient evidence of contract formation. (Oral Argument at 1:06:06-1:08:21.) Plaintiff asserted that an evidentiary hearing would be an appropriate next step, given the discrepancies in the record. (Oral Argument at 1:22:48-1:23:20; 1:29:39-1:30:46.) Both parties agree that the only issue for a hearing would be contract formation. (Oral Argument at 1:33:32-1:34:48.) For the reasons described below, the Court concludes that an evidentiary hearing is not necessary.

Citibank asks the Court to conclude that the Ms. Khuu's pleading is a judicial admission that withdrew from contention the issue of the formation of the arbitration agreement. (Doc. 25 at 424.) The Court agrees.

Rule 8 of the Federal Rules of Civil Procedure permits Plaintiffs to plead alternative claims, regardless of consistency. *See* Fed. R. Civ. P. 8(d). Pleadings are construed liberally to allow parties to develop the case, based on new information, and amend pleadings accordingly. *See In re King Enterprises, Inc.*, 678 F.2d 73, 77 (8th Cir. 1982) (affirming jury verdict where "the court properly refused to require King to elect a theory upon which to proceed"); *Rogers v. Restore Contracting, Inc.*, 721 F. Supp. 3d 630, 638 (S.D. Ohio 2024) (quoting *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005)) ("Although the

Federal Rules of Civil Procedure 'provide for liberal notice pleading at the outset of the litigation,' '[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a).'").

Admissions in pleadings may be considered judicial admissions. *See Missouri Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1315 (8th Cir. 1990) (giving effect to admission that party signed guaranty agreement where admission was later repudiated in discovery responses but not brought to attention of court before district court decided summary judgment motion). Akin to stipulations, judicial admissions have the effect of withdrawing a fact from contention. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE §801: 26. Judicial admissions are "binding upon the parties, unless withdrawn or amended." *Missouri Hous. Dev. Comm'n*, 919 F.2d at 1315. To establish that a statement constitutes a judicial admission, it must be "deliberate, clear, and unambiguous." *Acciona Windpower N. Am., LLC v. City of W. Branch, Iowa*, 847 F.3d 963, 968 (8th Cir. 2017) ("[W]e generally reject efforts to convert 'carelessly worded' stipulations into dispositive admissions."); *see also Grandoe Corp. v. Gander Mountain Co.*, 761 F.3d 876, 885 (8th Cir. 2014) (affirming district court finding where a carelessly worded stipulation that would have "immediately defeated Grandhoe's entire case" was not a deliberate, clear and unambiguous concession that agreement applied to the parties' entire transaction).

The Eighth Circuit has acknowledged tension between holding a party to an admission and allowing the party to "exercise[e] the liberal pleading . . . provisions of the Federal Rules." *Garman v. Griffin*, 666 F.2d 1156, 1159 (8th Cir. 1981) (remanding for retrial of negligence case involving fatal school bus accident where plaintiffs were permitted to admit into evidence allegation related to condition of bus sold by third party). In discussing the related doctrine of judicial estoppel, one court explained, "[t]he doctrine is not intended to protect litigants; instead, its purpose is to prevent intentional self-contradiction as a method of gaining an unfair advantage." *Brown v. Lanier Worldwide, Inc.*, 124 S.W.3d 883, 899 (Tex. App. 2004). In other words, it is intended to "protect the integrity of the judicial system." *Id.*

In the present case, the Plaintiff's assertion that upon account opening, "each customer receives a comprehensive Consumer Deposit Account Agreement . . . , which – along with the Fee Schedule – forms the contract between Citibank and the customer and provides the terms and conditions governing each deposit account held with Citibank" is deliberate, clear and

unambiguous. (Complaint, Doc. 1, ¶20.) This admission supports the Court's decision to compel arbitration.

To be clear, the inconsistency between the allegations related to contract formation and the resistance to arbitration has no bearing on the Plaintiff's entitlement to plead alternative theories such as breach of contract and unjust enrichment. *Anderson v. Edward D. Jones & Co., L.P.*, 990 F.3d 692, 700 (9th Cir. 2021) (reversing dismissal and remanding after recognizing plaintiff's opportunity to plead inconsistent theories of recovery). Furthermore, in another case, a plaintiff might allege a set of facts and legal theories that are consistent with distinguishing the arbitration terms of a contract from other terms. *Wadi Food Indus. Co. S.A.E. v. Barclays Bank Delaware*, No. 2:18CV554, 2019 WL 2169209, at *7 (E.D. Va. May 2, 2019), *report and recommendation adopted*, No. 2:18CV554, 2019 WL 2163605 (E.D. Va. May 17, 2019) (articulating the distinction "between pleading alternative liability *theories* with pleading *facts* that are unworkably inconsistent"); *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 416, (1996) ("[A]rbitration clauses must, under federal law . . . be viewed as 'separable' from other portions of a contract.") (citing *Prima Paint, supra,* 388 U.S. at 402)); RESTATEMENT OF LAW, CONSUMER CONTRACTS § 2 (distinguishing between "core" aspects of a transaction to which consumers knowingly assent and "non-core standard contract terms" to which they could be bound by inquiry notice). In such a case, the Court would not be inclined to compel arbitration on the basis of a judicial admission related to core elements of the consumer transaction.

However, in the present case, the Court declines to narrow the scope of the judicial admission and relieve the parties from its consequences. *Elec. Mobility Corp. v. Bourns Sensors/Controls, Inc.*, 87 F. Supp. 2d 394, 406 (D.N.J. 2000) ("While it is true that a judicial admission normally binds the party making it throughout the course of the action, it is also well-established that trial judges are given broad discretion to relieve parties from the consequences of judicial admissions in appropriate cases.") (citing Wigmore on Evidence § 2590 (Chadbourn rev.1981)). The present decision is not intended to expand any rule of estoppel under state law nor establish a novel theory for compelling arbitration; it is an exercise of the Court's discretion to evaluate the particular record before it.

Before reaching its conclusions in this case, the Court considered various cases involving arbitration of consumer disputes, including cases involving bank signature cards. *Compare Fong*

*v. U.S. Bancorp,* No. 23-16186, 2024 WL 3439584, at *2 (9th Cir. July 17, 2024) (vacating district court order compelling arbitration and distinguishing 1954 *Larrus* case about bank signature cards where "U.S. Bank has not shown that the Safe Deposit Box Lease Agreement was 'called to the attention' of . . . or 'easily available' to the [consumers whose safe deposit box was breached]") *with Safadi v. Citibank, N.A.,* No. 12-1356 PSG, 2012 WL 4717875, at *4 (N.D. Cal. Oct. 2, 2012) (compelling arbitration based on finding that consumer who did not recall receiving agreement was bound to terms "about which he failed to inquire"); *see also Driskill v. Experian Info. Sols., Inc.,* 2024 WL 4453292, at *5 (N.D. Cal. Oct. 8, 2024) (compelling arbitration where court finds Driskill's declaration was insufficient to create a genuine dispute of material fact on the issue of assent); *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 31 (2d Cir. 2002) (noting that "[r]eceipt of a physical document containing contract terms or notice thereof is frequently deemed, in the world of paper transactions, a sufficient circumstance to place the offeree on inquiry notice of those terms" while concluding that consumers did not assent to online transaction). Noting the variation across these cases, the Court is convinced that each case of contract formation must be decided based on the particular details of the record before it.

## B. Scope of the Arbitration Provision

Having concluded that an arbitration agreement exists, this Court must then determine whether the arbitration agreement applies to the present dispute. This analysis first looks to the language of the arbitration agreement to derive its meaning. In the event the language is ambiguous, the federal law of arbitrability appears to require resolution in favor of arbitration.[9] *Marselian v. Wells Fargo & Co.,* 514 F. Supp.3d 1166, 1171 (N.D. Cal. 2021) (quoting *Volt Info. Sciences, Inc. v. Bd. Of Trustees of Leland Stanford Jr. Univ.,* 489 U.S. 468, 476 (1989)) ("Courts must resolve 'any ambiguities as to the scope of the arbitration clause itself . . . in favor of

---

[9] The FAA's presumption in favor of arbitrability has been described in broad terms in some cases and more narrowly in others. *Compare Principal Invs. v. Harrison,* 132 Nev. 9, 15 (2016) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."); *with Volt Info. Sciences, Inc. v. Bd. Of Trustees of Leland Stanford Jr. Univ.,* 489 U.S. 468, 476 (1989) ("[D]ue regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration."). *See also Coinbase, Inc. v. Suski,* 602 U.S. 143, 148 (2024) (citing *Rent-A-Center, West, Inc. v. Jackson,* 561 U.S. 63, 67 (2010) ("The FAA . . . places arbitration agreements on an equal footing with other contracts."). Reconciling these statements with the requirements of contract law and other cases interpreting the FAA, this Court understands the presumption to apply principally to interpreting ambiguities in contracts.

arbitration.'"). The parties have not addressed issues of contract interpretation in detail in their filings, but the Court has examined the agreement in an effort to understand its scope.

The analysis begins by looking at the arbitration provision at page 66 of the Consumer Deposit Account Agreement that was attached to the Complaint. (Doc. 1-1 at 91.) These terms mirror the excerpts of the Client Manual, which were reproduced above. Under the sub-heading "How Arbitration Works," the Consumer Deposit Account Agreement provides:

> Arbitration may be requested at any time, even when there is a pending lawsuit, unless a trial has begun or a final judgment entered. . . . To choose arbitration, a party may file a motion to compel arbitration in a pending matter and/or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.

(Doc. 1-1 at 92 (emphasis added).)  This provision that explains a party can "choose arbitration" by "fil[ing] a motion to compel" is consistent with Citibank's position that arbitration is required under the agreement in this case.  When paired with other language of the Consumer Deposit Account Agreement providing "[i]f arbitration is chosen . . . . neither [party] . . . will have a right to litigate," the reference to "fil[ing] a motion to compel" provides strong support for the bank's position that arbitration is required under the terms of the agreement for consumers who have not opted out of arbitration during the first 45 days. (Doc. 1-1 at 91.)

The references to both "requesting" and "choosing" arbitration, as well as the absence of the Client Manual's clear explanation that "you cannot go to court . . ." muddies Citibank's position that arbitration is required here and compelled the Court to consider the possibility that the arbitration terms are optional.[10] (*See* Doc. 154 at 285)  Nevertheless, taking all the terms of the

---

[10] The language of the Consumer Deposit Account Agreement includes repeated references to the *possibility* of arbitration if *chosen* by a party:

> DISPUTES **MAY** BE RESOLVED BY BINDING ARBITRATION.  (*Emphasis added*) . . .

> You or we **may** arbitrate any claims, dispute or controversy between you and us . . . .

> If arbitration **is chosen** by any party, neither you nor we will have the right to litigate that Dispute in court or have a jury trial on that Dispute.

> Except as stated below, all Disputes are **subject to** arbitration . . . . A party who initiates a proceeding in court **may elect** arbitration with respect to any dispute advanced in that proceeding by any other party.

> (Doc. 1-1 at 91) (*Emphasis altered)*.

Consumer Deposit Account Agreement together, the better reading of this language is—consistent with Citibank's position—to require arbitration once any party has "requested" or "chosen" it.

The Court leaves to the consideration of the arbitrator the challenges to the enforceability of the arbitration agreement based on the *McGill* rule and other remaining questions. Following the approach of the Eight Circuit, this Court sees no other issues that require its consideration and analysis at this stage. *Eckert/Wordell Architects, Inc. v. FJM Props. of Wilmar, Ltd. Liab. Co.*, 756 F.3d 1098, 1100 (8th Cir. 2014)); *see also Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769 (8th Cir. 2011), *abrogated on other grounds*, *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).

IT IS ORDERED:

1. Motion to Compel Arbitration is GRANTED;
2. Proceeding are STAYED pending arbitration; and.
3. Each six months from the date of this opinion and order, the parties are to submit a joint report on the status of the arbitration.

Dated this 28th day of March, 2025

BY THE COURT:

LAWRENCE L. PIERSOL
United States District Judge

---

These statements each suggest that the Plaintiff had an option to pursue this dispute in arbitration at the outset. Without more, these statements would be insufficient to conclude that arbitration is required in a case such as this where the plaintiff has initiated proceedings in federal court. However, other language in the arbitration provision offers stronger support for Citibank's position that the agreement, if not opted-out of, requires arbitration.